# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

RAYMOND WILLOUGHBY,     )
DAMIEN WARD, and DAN COOPER,  )
                )
   Plaintiffs,       )
                )   No.  17 CV 2800
   v.           )
                )   Judge Ronald A. Guzmán
VILLAGE OF FOX LAKE,     )
COMMANDER GEORGE FILENKO,  )
JOHN DOE POLICE OFFICERS,   )
JOHN DOE DEPUTY SHERIFFS,   )
JOHN DOE STATE POLICE AGENTS, )
and JOHN DOE FEDERAL BUREAU OF )
INVESTIGATION AGENTS,     )
                )
   Defendants.      )

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, the Village of Fox Lake's motion to dismiss Count II of the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is denied, and George Filenko's motion to dismiss Count I of the Second Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) is granted.

## BACKGROUND

The following facts are drawn from plaintiffs' Second Amended Complaint and taken as true for purposes of these motions. On September 1, 2015, Charles Joseph Gliniewicz, a police lieutenant for the Village of Fox Lake, Illinois (the "Village"), committed suicide in a secluded area in Fox Lake by shooting himself twice. (2d Am. Compl. ¶ 14.) Shortly beforehand, in an effort to stage his suicide to look like a homicide, Gliniewicz had sent a radio transmission to the Fox Lake police department in which he falsely stated that he was in pursuit of three people

whom he described only as two "male whites" and one "male black." (*Id.* ¶¶ 14-15.) It was later revealed that Gliniewicz's actions were likely motivated by a probe of the Fox Lake police department by its village manager, who was then on the verge of discovering that Gliniewicz had embezzled funds from the Explorer program, a Village program he had led for youths in the community who had an interest in law enforcement. (*Id.* ¶ 15.)

Gliniewicz's death received immediate national media coverage, and an expansive investigation began immediately, with participation by officers from numerous municipal police departments in Lake County (pursuant to the Lake County Major Crimes Task Force (the "Task Force," at the Village's request for assistance), as well as the Lake County Sheriff's Department, the Illinois State Police, and the Federal Bureau of Investigation. (*Id.* ¶ 16.) Officers of members of the Task Force who participated in the investigation acted under the direction of defendant Commander George Filenko. (*Id.* ¶ 22.)

Unbeknown to the public, there was good reason at the outset to suspect that Gliniewicz's death was a suicide, and even the initial responders from the Fox Lake police department noted irregularities that were inconsistent with a murder. (*Id.* ¶ 19.) Despite this knowledge, the Fox Lake police department continued to perpetuate the narrative that Gliniewicz's death was a homicide, and continued to participate extensively in, and detain citizens pursuant to, an investigation that they knew or had reason to know was "pure fiction." (*Id.* ¶ 20.) The agencies and officers assisting the Fox Lake police department also perpetuated the false narrative and detained citizens without probable cause. (*Id.* ¶ 21.) In connection with the investigation, as many as 100 people were "stopped, questioned, arrested, or otherwise detained and deprived of their liberty as purported suspects." (*Id.* ¶ 18.)

Plaintiffs, Raymond Willoughby, Damien Ward, and Dan Cooper, were among these people. Willoughby and Ward were arrested on the day of Gliniewicz's suicide. (*Id.* ¶¶ 3-4.) Willoughby was traveling along the woods near his house when he was arrested by unidentified police officers. (*Id.* ¶ 41.) He was handcuffed, held at the scene for one to two hours, and then transported to the Round Lake police department, where he was held for several more hours and then released. (*Id.* ¶¶ 43-45.) Ward was leaving his home that morning when he was confronted by law enforcement personnel, handcuffed, and taken into custody. (*Id.* ¶¶ 46, 48.) Unidentified officers tried to enter Ward's home without a search warrant. (*Id.* ¶ 50.) Ward was ordered to submit to a gunshot-residue test and then released after about two hours. (*Id.* ¶¶ 51-52.) The next day, Cooper was handcuffed and taken by several unidentified defendants to the Fox Lake police station. (*Id.* ¶¶ 53-54.) He was released after about ten hours. (*Id.* ¶ 57.) None of the plaintiffs had committed any crimes or broken any laws, and there was no probable cause for their seizures. (*Id.* ¶¶ 42, 47, 56, 58.)

The investigation of Gliniewicz's death and plaintiffs' arrests were the "byproduct of rampant official misconduct rising to the level of a *de facto* policy of condoning such misconduct amongst Fox Lake police officers." (*Id.* ¶ 23.) Gliniewicz, during his thirty years with the Fox Lake police department, was the subject of numerous departmental and citizen complaints for misconduct that included passing out from intoxication while behind the wheel of his car and, after being helped home by a police officer, reporting his vehicle as stolen the next day; public intoxication; threatening to shoot a dispatcher; sexual harassment; and repeated tardiness and/or absence, including absence "attributed to alcohol." (*Id.* ¶¶ 24, 27.) Despite these incidents, Gliniewicz rose through the ranks of the department, eventually attaining the rank of Lieutenant. (*Id.* ¶ 25.) The lack of attention to official misconduct was so pervasive that

on February 1, 2009, one or more members of the department wrote anonymously to the Village mayor about Gliniewicz's conduct and police chief Michael Behan's lack of oversight. (*Id.* ¶ 26.) The authors of the letter cited various incidents of Gliniewicz's misconduct and stated that they had complained to Behan about Gliniewicz's actions, but were "'disappointed time and time again with Chief Behan's lack of action.'" (*Id.* ¶ 27.) The authors of the letter also alleged that "'[o]n many arrests, the person being arrested has cautioned the officer about continuing the arrest because they were personal friends with 'Joey' [Lt. Gliniewicz] or 'Mikey' [Chief Behan].'" (*Id.*) In spite of these allegations made directly to the mayor, Gliniewicz and Behan remained in their supervisory positions for six years thereafter. (*Id.* ¶ 28.)

In 2014, Anne Marrin began serving as the Village Administrator. (*Id.* ¶ 29.) Among her tasks was auditing Village divisions, including the police department's Explorer program that Gliniewicz operated. (*Id.*) In August 2015, Marrin requested the Explorer program's books and records from Gliniewicz. (*Id.* ¶ 35.) Gliniewicz evidently resented Marrin because he feared that her audit would reveal that he had been embezzling funds from the Explorer program for personal use. (*Id.* ¶¶ 31.) He considered such outrageous retaliatory measures as planting cocaine on Marrin and advocating for arranging with a gang member for a murder for hire. (*Id.* ¶ 30.) Members of the Fox Lake police department, including Chief Behan, were aware of Gliniewicz's embezzlement and did nothing to intervene. (*Id.* ¶ 32.) On the morning of August 31, 2015, less than twenty-four hours before Gliniewicz committed suicide, Gliniewicz sent Behan a text message regarding the embezzlement, stating that Marrin "has now demanded a complete inventory of exploder [sic] central and financial report . . . FML." (*Id.* ¶¶ 36-37.) "FML" is an abbreviation that means "fuck my life." (*Id.* ¶ 36 n.2.)

Other upheaval in the Fox Lake police department also occurred during the same time frame. Behan had been placed on administrative leave in August 2015 in relation to his alleged failure to adequately investigate an excessive-force incident. (*Id.* ¶ 33.) Shortly thereafter, he announced his retirement, and he formally retired on the day before Gliniewicz's death. (*Id.* ¶¶ 33-34.) Despite Behan's retirement, he continued to exercise involvement and authority over the Fox Lake police department, including being physically present at the scene of the suicide and at the department that day. (*Id.* ¶ 34.) But Behan and Fox Lake personnel "either did not share Gliniewicz's history of misconduct and the department's history of ignoring his misconduct, diminished the significance of [the] same, or encouraged that it not be considered in the investigation into his death." (*Id.* ¶ 38.) Furthermore, Behan did not share with investigators the text message that Gliniewicz had sent him the previous day, which would have suggested the possibility of suicide. (*Id.*)

Plaintiffs sue the Village, Filenko, and John Doe municipal police officers, deputy sheriffs, state police officers, and FBI agents.[1] The Second Amended Complaint contains two counts. Count I is a claim under 42 U.S.C. § 1983 for unlawful search and seizure in violation of the Fourth Amendment. Count II is a claim against the Village based on *Monell v. Department of Social Services*, 436 U.S. 658 (1978). The Village moves to dismiss the *Monell* claim. Filenko moves to dismiss Count I.

---

[1]Plaintiffs also seek to represent a class of "all other persons that [were] stopped, questioned, arrested, or otherwise detained and deprived of their liberty as purported suspects" in the investigation of Gliniewicz's death. (2d Am. Compl. ¶ 6.) The Court has set a briefing schedule on plaintiffs' recently-filed motion for class certification.

**LEGAL STANDARDS**

"A motion under Rule 12(b)(6) tests whether the complaint states a claim on which relief may be granted." *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). The complaint must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (ellipsis omitted). A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* Stated differently, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

**ANALYSIS**

**A.     The Village's Motion**

Plaintiffs allege that the Village violated their Fourth Amendment right to be free from unreasonable searches and seizures. In particular, they allege that the Village's practices of failing to train, monitor and supervise its officers, thus maintaining a culture of rampant official misconduct, and of condoning and failing to prevent, investigate, and discipline official misconduct among its officers, constituted the moving force behind their constitutional injuries. (2d Am. Compl. ¶¶ 40, 75-85.) To establish the Village's § 1983 liability pursuant to *Monell*, plaintiffs must show that they were deprived of a federal right, as a result of an express municipal policy, a widespread Village custom or practice, or the deliberate act of a Village policymaker, which proximately caused their injury. *See Davis v. Carter*, 452 F.3d 686, 691 (7th Cir. 2006).

The Village contends that plaintiffs fail to plead facts sufficient to state a *Monell* claim. In the Village's view, plaintiffs' theory that the Village's widespread practices were the moving force behind their constitutional deprivations is "much too attenuated" and involves an implausible "logical leap" that the Village's practices resulted in officers from other municipalities committing constitutional violations. (ECF No. 58, Vill.'s Mot. at 5-6.) The Village contends that a "single instance does not sufficiently support a 'widespread practice' theory, and this instance was very unique." (*Id.* at 6 (citation omitted).) The Village further argues that plaintiffs' allegations about Marrin's actions and Behan's administrative leave "undermine" their theory that the Village lacked oversight, such that "it seems from the allegations that Fox Lake was disciplining its high ranking officers for malfeasance, and when Fox Lake got too close to discovering Gliniewicz's crimes, he committed suicide and staged it as a murder." (*Id.*)

The Court sees it differently. An investigation is not the equivalent of discipline, and as for discipline, plaintiffs allege just the opposite—that there was a lack of it for years. The Village disregards the well-settled principle that on a motion to dismiss, the plaintiffs' well-pleaded factual allegations are accepted as true and all reasonable inferences drawn in plaintiffs' favor. *See Kubiak v. City of Chi.*, 810 F.3d 476, 480-81 (7th Cir. 2016). Plaintiffs have pleaded specific accounts of incidents in which the Village failed to investigate or discipline officers for misconduct, even upon complaints from fellow employees, and that the unaddressed misconduct reached the highest levels and was so pervasive that it eventually constituted a "culture" within the department pursuant to which officers believed that misconduct would go unpunished or even be rewarded. Plaintiffs have also pleaded that Behan himself was under investigation for misconduct that occurred as part of the Village's culture; he was aware of Gliniewicz's

embezzlement; he continued *even after his retirement* to exercise involvement and authority over the Village police department, including at the scene of Gliniewicz's death; and he concealed the "FML" text message from the Task Force investigators.

It can reasonably be inferred from plaintiffs' allegations that 1) the Village's practice of failing to supervise or discipline Gliniewicz and Behan facilitated their misbehavior in the form of the embezzlement scheme that evidently had been ongoing for some time; 2) it was the embezzlement scheme (or, rather, its imminent discovery) that led to Gliniewicz's suicide;[2] and 3) the Village's failure to supervise or discipline Behan resulted in his concealment of both the embezzlement scheme and the likelihood that Gliniewicz's death was actually a suicide, thus leading to the manhunt that included plaintiffs' arrests. (It is also possible to reasonably infer from plaintiffs' allegations that Chief Behan's actions, including his concealment of the likelihood of Gliniewicz's suicide, were those of a final policymaker for the Village, which would be sufficient to establish liability under the third *Monell* prong.) Plaintiffs have therefore set out facts sufficient to allege that the Village was responsible for launching the manhunt for Gliniewicz's nonexistent killers. Ultimately, plaintiffs will have to prove a nexus between the initiation of the manhunt and their alleged arrests without probable cause. That may be a tall order, but discovery will reveal who gave whom what directives during the Task Force investigation. At this stage, however, plaintiffs have met their pleading burden by alleging facts that, taken together and in the light most favorable to plaintiffs, create the plausible inference

---

[2]The Village places great emphasis on the "bizarre" and "completely unpredictable" nature of Gliniewicz's suicide. The precise nature of his final act of police misconduct is too narrow a focus. The plaintiffs' allegations about Gliniewicz's prior misconduct include several instances of outrageous abuses of power. In any event, the Village's focus is misplaced because plaintiffs are not challenging Gliniewicz's actions, but the Village's policies that allegedly led to the violation of their constitutional rights.

that the Village's policies created the risk of constitutional injury to the public. And because plaintiffs describe the nature of the Task Force and allege that officers from other municipalities were involved in the investigation of Gliniewicz's death due to the Village's request for the Task Force's assistance, (2d Am. Compl. ¶¶ 8, 16), the fact that officers from other municipalities may have effected plaintiffs' arrests does not render plaintiffs' claims against the Village implausible.

Because plaintiffs have alleged facts that support a reasonable inference that the Village maintained widespread practices that caused the violation of their constitutional rights, the Village's motion to dismiss Count II is denied.

## B.    Filenko's Motion

Filenko is named as a defendant in Count I of plaintiffs' complaint. The entirety of plaintiffs' allegations concerning Filenko is as follows:

- At all relevant times, Filenko was the Commander of the Task Force acting within the scope of his employment and under color of law, and "both personally contributed to and supervised the wrongs committed."

- Task Force officers acted "with and under the direction of Defendant Filenko. Filenko thus personally participated in the acts giving rise to this lawsuit, in that he personally participated in, sanctioned, supervised, and approved the actions taken in said fictitious investigation."

- Filenko "personally participated in and supervised the conduct complained of."

(2d Am. Compl. ¶¶ 12, 22, 70.)

Filenko contends that these allegations are threadbare and that plaintiffs have failed to plead facts from which it can be inferred that Filenko is liable for any constitutional violations. The Court agrees. The doctrine of *respondeat superior* cannot be used to hold a supervisor liable for conduct of a subordinate that violates a plaintiff's constitutional rights. *Chavez v. Ill.*

*State Police*, 251 F.3d 612, 651 (7th Cir. 2001). In order for a supervisor to be liable, he must be "personally responsible for the deprivation of the constitutional right." *Matthews v. City of E. St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012). To have personal involvement, the supervisor must "know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what [he] might see." *Id.* The manner in which plaintiffs have alleged Filenko's personal involvement appears to improperly rely on a *respondeat superior* theory; in paragraph 22 of the complaint, they allege that because Task Force officers generally acted at Filenko's direction, he "thus" personally participated in the complained-of conduct. Moreover, plaintiffs' allegations of Filenko's personal involvement do not comply with *Iqbal* because they are merely abstract recitations and fail to put Filenko on notice of what exactly he might have done to violate plaintiffs' rights. *See Brooks v. Ross*, 578 F.3d 574, 582 (7th Cir. 2009). Accordingly, Filenko's motion to dismiss Count I is granted.

## CONCLUSION

The Village of Fox Lake's motion to dismiss Count II pursuant to Federal Rule of Civil Procedure 12(b)(6) [58] is denied. George Filenko's motion to dismiss Count I pursuant to Federal Rule of Civil Procedure 12(b)(6) [59] is granted. Count I is dismissed without prejudice as to defendant George Filenko. Plaintiffs are given leave to replead Count I by January 5, 2018.

**DATE**: December 21, 2017

_____
**Ronald A. Guzmán**
**United States District Judge**